Case 1:20-cr-00329-GLR   Document 83   Filed 10/12/23   Page 1 of 18

✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

9:14 am, Oct 13 2023
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

---

Paul A. Riley
Assistant United States Attorney
Paul.Riley@usdoj.gov
*PEB* 8.3.23

Mailing Address:
36 S. Charles Street, 4th Floor
Baltimore, MD 21201

Office Location:
36 S. Charles Street, 4th Floor
Baltimore, MD 21201

DIRECT: 410-209-4959
MAIN: 410-209-4800
FAX: 410-962-0716

August 3, 2023

Andrew R. Szekely, Esq.
Supervisory Assistant Federal Public Defender
Office of the Federal Public Defender for the District of Maryland
100 S. Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201

      Re:    <u>United States v. Michael Ghali</u>, Criminal No. GLR-20-329

Dear Counsel:

      This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Michael Ghali (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by August 18, 2023 it will be deemed withdrawn. The terms of the Agreement are as follows:

Offense of Conviction

      1.    The Defendant agrees to plead guilty to Count One of the Indictment, which charges the Defendant with Cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B). The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

Elements of the Offense

      2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the dates specified in Count One of the Indictment:

      a.    The Defendant intended to kill, injure, harass, or intimidate another person;

      b.    The Defendant used the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate commerce to engage in a course of conduct; and

Rev. August 2018

c.       The course of conduct caused, attempted to cause, or was reasonably expected to cause substantial emotional distress to that person or an immediate family member.

## Penalties

3.       The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| One | 18 U.S.C. §§ 2261A(2)(B), 2261(b)(6) | 1 year | 5 years | Max: 3 years | $250,000 | 18 U.S.C. § 3013(a): $100 |

a.       Prison:  If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b.       Supervised Release:  If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c.       Restitution:  The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664, and 18 U.S.C. § 2259(b)(2)(b) (mandatory restitution of no less than $3,000 for victims of child exploitation).

d.       Payment:  If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d).  The Defendant may be required to pay interest if the fine is not paid when due.

e.       Forfeiture:  The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f.       Collection of Debts:  If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt.  If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law.  Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control.  Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns.  The Defendant

agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

   a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

   b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

   c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

   d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

   e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

   f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.      This Office and the Defendant stipulate and agree to the Stipulation of Facts set forth in Attachment A, which is incorporated by reference herein. Furthermore, pursuant to § 1B1.2(c), this Office and the Defendant agree that the Statement of Facts establishes the commission of an additional offense by the Defendant that shall be treated as if the Defendant had been convicted of an additional count charging that offense.

### Count One (Group 1) (Offense of Conviction) – Cyberstalking of M.B.)

a.      The parties agree that the applicable base offense level for Cyberstalking is **eighteen (18)** pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2A6.2(a).

b.      The parties further agree that pursuant to U.S.S.G. § 2A6.2(b)(1) there is a **four (4)** level increase because the offense involved the violation of a court protection order and a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim. **(Subtotal: 22)**.

### Count Two (Group 2) (Agreed Conduct – Interstate Threats to H.B.)

c. The parties agree that the applicable base offense level for Threats Transmitted by Interstate Commerce is **twelve (12)** pursuant to U.S.S.G. § 2A6.1(a)(1).

d. This Office contends that pursuant to U.S.S.G. § 2A6.1(b)(1) there is a **six (6)** level increase because the offense involved any conduct evidencing an intent to carry out such threat and reserves its right to argue this at sentencing. The Defendant objects to this enhancement. **(Subtotal: 18 or 12)**.

e. The parties further agree that pursuant to U.S.S.G. § 2A6.1(b)(2) there is a **two (2)** level increase because the offense involved more than two threats. **(Subtotal: 20 or 14)**.

Grouping:

f. Pursuant to U.S.S.G. § 3D1.4, the total number of units is either **two (2)** if the enhancement under U.S.S.G. § 2A6.1(b)(1) applies, or **one and a half (1 ½)** if it does not and therefore the highest offense level **(22)** is increased by **two (2)** levels or **one (1)** level. **(Subtotal: 23 or 24)**.

g. This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

h. Accordingly, the anticipated adjusted offense level is either **21 or 20**.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

Rev. August 2018

## Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence (subject to paragraph 10 below), period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

10. At the time of sentencing, the Defendant reserves the right to argue of a sentence of time-served, and this Office agrees to advocate for a reasonable sentence within the applicable sentencing guidelines range. This Office and the Defendant further agree that the following special conditions are appropriate in this case:

   a. Pay $100 Special Assessment.

   b. You must not communicate, or otherwise interact, with victims M.B., H.B., any of their family members, or any member or employee of the Hospital that employees them either directly or through someone else, without first obtaining the permission of the probation officer.

   c. You must take all mental health medications that are prescribed by your treating physician.

   d. You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

   e. You must allow the probation officer to install computer monitoring software on any computer (as defined in 18 U.S.C. § 1030(e)(1)) you use. You must not make any attempt to circumvent or inhibit the software after its installation.

   f. To ensure compliance with the computer monitoring condition, you must allow the probation officer to conduct initial and periodic unannounced searches of any computers (as defined in 18 U.S.C. § 1030(e)(1)) subject to computer monitoring. These searches shall be conducted for the purposes of determining whether the computer contains any prohibited data prior to installation of the monitoring software; to determine whether the monitoring software is functioning effectively after its installation; and to determine whether there have been attempts to circumvent or inhibit the monitoring software after its installation. You must warn any other people

who use these computers that the computers may be subject to searches pursuant to this condition.

g. You will be monitored by a form of location monitoring technology for a period of 12 months, and you must follow the rules and regulations of the location monitoring program. You must pay the costs of the program as directed by the probation officer.

## Waiver of Appeal

11. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Restitution

12. The Defendant agrees to the entry of a restitution order for the full amount of the victim's losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant agrees to make full restitution to all victims of his offenses as to all counts charged, whether or not the defendant enters a plea of guilty to such counts and whether or not such counts are dismissed pursuant to this agreement. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer,

and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

## Forfeiture

13. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

14. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities:

   a. A Glock 44, semi-automatic, .22LR caliber firearm, serial number AEFZ951;

   b. Streak Visual Ammunition, .44 Special, FMJ, 220 Grain, approximately 20 rounds;

   c. 3 boxes of .44 caliber Ammunition (FBI item # 1B14).

15. The Defendant understands that he would have a right to file a claim to the Abandoned Property under 41 C.F.R. § 128-48.102-1 and waives his right to claim the Abandoned Property under 41 C.F.R. § 128-48.503. The Defendant agrees not to contest the vesting of title of the Abandoned Property in the United States Government and agrees to unconditionally release and hold harmless the United States Government, its officers, employees, and agents, from any and all claims, demands, damages, causes of actions, suits, of whatever kind and description, and wheresoever situated, that might now exist or hereafter exist by reason of or growing out of or affecting, directly or indirectly, the seizure or waiver of ownership interest in the Abandoned Property. The Defendant agrees to execute any documents as necessary to the waiver of right, title and interest in the Abandoned Property, including any forms necessary to effect the Defendant's waiver of ownership interest.

16. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding

forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

17. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

18. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

### Abandonment

19. The Defendant knowingly and voluntarily waives any right, title, and interest in the following property:

   a. A Microsoft Surface Pro Serial Number 025613453152;

   b. A Dell Laptop Model P30E;

   c. An ASUS Laptop Model Q524U;

   d. An Apple iPhone 7 IMEI 353 802 082 070 675;

   e. An Apple iPhone 7 IMEI 359 458 087 373 582;

   f. A PNY USB Micro Storage Device 16GB (Thumbdrive); and

   g. a Glock 44 magazine, .22LR, 10 round capacity.

(the "Abandoned Property") and consents to its federal administrative disposition, official use, and/or destruction.

### Defendant's Conduct Prior to Sentencing and Breach

20. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will

cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

21. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Court Not a Party

22. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

23. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

_____
Paul A. Riley
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

10/12/23
Date

_____
Michael Ghali
Defendant

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

10/12/23
Date

_____
Andrew R. Szekely, Esq.
Defendant's Attorney

## ATTACHMENT A

### STIPULATION OF FACTS

*The undersigned parties stipulate and agree that the following facts are true and accurate, and that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The Defendant, Michael Ghali, born August 1988, was a resident of Fairfax, Virginia. Beginning in June 2020 and continuing through August 2020, Defendant repeatedly harassed and threatened victims M.B., H.B. and others—all residents of Maryland—using the phone, email, text message, and social media posts. His offense is described in further detail below.

**Defendant's Cyberstalking Of M.B.**

Beginning on June 19, 2020 and continuing through June 23, 2020, Defendant sent Victim M.B., an acquaintance whom he knew from their church, a series of sexually explicit and threatening text messages using an application called TextMe, which allows users to acquire phone numbers to send text messages that they don't want to be associated with their known phone number.

On June 19, 2020, Defendant sent M.B. a photograph of an unconscious or dead male, covered in blood who appears to be propped up against a wall, which is also covered in blood. Later that day, Defendant sent M.B. the following message:

> I heard about your services. I will pay you $6,000 for 3 hours. Come to my place.
>
> Jim

On June 23, 2020, Defendant sent M.B. the following message: "Hi baby. I want to creampie your pussy. Come[.]" Later that day, Defendant sent M.B. a link to a pornographic video that did not depict M.B., along with the following message:

> I found this video of you conducting indecent acts online. I will disseminate this throughout your work and church community of believers if you fail to provide me with what I demand

That same day, Defendant sent M.B. a message that contained her name and the city in Maryland in which she resided.

On or about June 26, 2020 Defendant posted M.B.'s photo—without her knowledge or consent—as his "profile picture" on his publicly-available Facebook page. On June 27, 2020, M.B. sent Defendant two text messages to Defendant's phone number (703-577-4848), asking him to remove the Facebook photo and stating that she will call the police if he does not remove the photo.

Rev. August 2018

On June 27, 2020 at 11:54 p.m., Defendant wrote back to M.B. using phone number 703-577-4848. The lengthy message began with M.B.'s name and went into graphic and explicit detail describing the sex acts Defendant wanted to engage in with M.B. M.B. and Defendant had no prior intimate or romantic relationship.

On June 30, 20, 2020, Defendant sent M.B. another message, which stated:

> I want to eat and fuck your pussy all night long and I want you to give me a sloppy blowjob, baby. I heard how incredible you are. I'll give you three hundred dollars

On July 2, 2020, Defendant falsely claimed on his Facebook page that M.B. and another individual were engaged and multiple times on July 5 2020, Defendant created Facebook posts about M.B. and another individual being in a relationship and which also mentioned M.B.'s sister by name.

On July 5, 2020, Defendant sent M.B. another message mentioning her sister by name: "[A.C.] sucked your fiance's Jake's cock for a cheeseburger and a hot dog before lunch last week from Paul [H.B.] and [S.A.] mit grossen lieben Life in prison without parole in triplicate succession."

As a result of this series of messages and Facebook posts, M.B.—who was distressed by the messages and feared for her and her family's physical safety—called the Anne Arundel County Police Department and filed for and ultimately obtained a protective order that became effective on July 7, 2020.

On July 10, 2020, Defendant's messages to M.B. continued. Defendant sent a series of messages threatening M.B. with physical harm, including the following messages: "I will personally cut off your clitoris and tongue." "[M.B.], you do not understand the depth of my capacity for injuring you in ways you have not contrived possible," and



> mgzghali2164
> I will actually make you quadriparetic, dumb, mute, deaf, and blind

> mgzghali2164
> I will cripple you in ways you didn't dream posdible

> mgzghali2164
> Stop fornicating or live a cripple

> mgzghali2164
> You will remember this series of text messages when people are turning you to bathe you and feed you enterally

> mgzghali2164
> You will dread this for the rest of your life

Rev. August 2018



mgzghali2164
Stop fornicating or lose the ability to walk or use your arms

mgzghali2164
I will personally spinalize you

### Defendant's Emails To H.B.

Around the same approximate time Defendant was harassing M.B., he was likewise harassing another individual—H.B. H.B. was the head of a medical department at a Baltimore-based hospital (the "Hospital") and knew of Defendant, as Defendant had previously completed a short medical rotation at the Hospital. M.B. was likewise worked at the Hospital during the period of Defendant's harassment.

On June 24, 2020, Defendant sent Victim H.B. an email he drafted from email address xxxxultimatumxxxx@gmail.com, which accused H.B. of sexually abusing employees in the medical department and minors, and which claimed to have photos of the abuse. The human resources department of the Hospital and another doctor who was one of H.B.'s colleagues were also recipients of the email.

Defendant demanded in the email that H.B. resign from his position at the Hospital and threatened to send the purported photos of the abuse to the press. Defendant signed the email from "B.H. Obama." A portion of the email is below:

> To whom it may concern:
> We have testimonial and pictorial evidence to indicate [H.B.] coerces cyprians receiving a titular sum in exchange for sexual services, secretarial staff, residents, and medical student candidates, and individuals retrogressively receding legally-defined adult maturity into the adolescent and tender childhood years, to the otherwise distinguished and blemishless . . . program at [the Hospital] to engage in sexual expeditions including, though not limited to fellatio, receptive and expressive anal intercourse involving unnatural transgression of variable extents of the phallus subtending from an orificial lumen pseudo-inaugurally pseudo-perforating the tip of the corona heading or capping it across the variably circumscribing margin towards its shafted base past the anal orifice, canal, and verge and proximal extents of the triplicately folded rectum, variably objectionable positions by which the phallus may be introduced para-translabially through the inaugurally hooded introduction into the otherwise variably capacious vaginal canal pre-terminally os-perforatively capped by the naturally defected cervix by exercisingly wielding the power naturally accompanying his titular position and entrusted stewardship, to the pre-terminally corroborative end of having identified photographic and videographic recordings of such acts in progress with the otherwise distinguished and brilliant [J.T.] residentially staffing his department. We are calling for his immediate resignation from the seat of our venerable Patriarch of Neurosurgery the faultless, noble, lofty, and meritorious Chairman and Emeritus Professor . . . to be replaced by Emeritus Professor . . . . Failure of resignation of Dr. [H.B.] from the Chairmanshio of the Department will coercively force our hands against our otherwise noble intentions to coordinately take legal action against the [Hospital] and leaking the data to outlet media sources to the para-intentional end of sullying the currently

untarnished reputation of the precessively preceding. We have made Chief Justice John Roberts Stevens abreast of the horrendous state-of-affairs. A prompt response to the foregoing allegations will behoove all parties involved.
With best wishes,
B.H. Obama

Defendant attached to the email an image of Dr. J.T., one of the individuals referenced in the email, and a hyperlink to a pornographic video.

On June 28, 2020, Defendant sent Victim H.B. an email he drafted from email address rorygoodwinduke@gmail.com, which again accused H.B. of sexually abusing employees in the medical department and minors, and which again claimed to have photos of the abuse. The email was likewise sent to various other individuals, including one of H.B.'s colleagues, an employee of United States Senator Chris Van Hollen, an academic email address at George Washington University that belonged to United States Supreme Court Justice Clarence Thomas, and CNN reporter and television host Wolf Blitzer.

Defendant again demanded in the email that H.B. resign from his position at the Hospital and threatened to send the purported photos of the abuse to the press. A portion of the email is below:

To whom it may concern:
We have testimonial and pictorial evidence to indicate [H.B.] coerces cyprians receiving a titular sum in exchange for sexual services, secretarial staff, residents, and medical student candidates, and individuals retrogressively receding legally-defined adult maturity into the adolescent and tender childhood years, to the otherwise distinguished and blemishless Neurosurgery program at The [Hospital] to engage in sexual expeditions including, though not limited to fellatio, receptive and expressive anal intercourse involving unnatural transgression of variable extents of the phallus subtending from an orificial lumen pseudo-inaugurally pseudo-perforating the tip of the corona heading or capping it across the variably circumscribing margin towards its shafted base past the anal orifice, canal, and verge and proximal extents of the triplicately folded rectum, variably objectionable positions by which the phallus may be introduced translabially through the inaugurally hooded introduction into the otherwise variably capacious vaginal canal pre-terminally os-perforatively capped by the naturally defected cervix by exercisingly wielding the power naturally accompanying his titular position and entrusted stewardship, to the pre-terminally corroborative end of having identified photographic and videographic recordings of such acts in progress with the otherwise distinguished and brilliant Dr. [J.T.] residentially staffing his department . We are calling for his immediate resignation from the seat of our venerable Patriarch of Neurosurgery the faultless, noble, lofty, and meritorious Chairman and Emeritus Professor [H.C.] to be replaced by Emeritus Professor [N.T.]. Failure of resignation of Dr. [H.B.] from the Chairmanshio of the Department will coercively force our hands against our otherwise noble intentions to take legal action against the [Hospital] to the successive end of having thus followed through upon our precedingly presented indication to coney the pre-convictive allegations to outlet media sources to the para-intentional end of sullying the currently untarnished

reputation of the precedingly precedent. A prompt response to the foregoing allegations will protect and behoove accusers and accused alike, respectively.
With best wishes,
[RG], M.D., Ph.D

Defendant again attached to the email an image of Dr. J.T., one of the individuals referenced in the email, and a hyperlink to a pornographic video.

On June 30, 2020, Defendant sent Victim H.B. another email he drafted from email address xxxxultimatumxxxx@gmail.com, which threatened the lives H.B. and his grandchildren. The email—together with the other emails Defendant sent H.B.—caused H.B. and his family fear and emotional distress and caused H.B. to alter his pattern of life as a result, including by hiring a professional security detail and changing his surgical schedule and other schedules in his life.

H.B. suspected Defendant sent the messages and became aware that Defendant had in 2019 been charged with brandishing an AR-15 assault rifle within 1000 feet of a school.

Defendant stated in the June 30, 2020 email:

[H.B.],
Shutdown the MK Ultra computers running at or near [the Hospital] off this
Evening to the end of protecting the lives of thy children and thy grandchildren.
You know who I AM

Defendant created the xxxxultimatumxxxx@gmail.com and rorygoodwinduke@gmail.com email addresses for the purpose of sending the threatening messages to H.B., and the recovery phone number associated with each of the accounts (703-577-4848 ) belonged to Defendant. The recovery email address associated with each of the accounts was alexandermarkosyasargil@gmail.com, another email address created by Ghali.

As a result of these messages, the Hospital on July 21, 2020 obtained a temporary restraining order and ultimately a preliminary injunction against Defendant on behalf of H.B., M.B., and others, which was thereafter in effect.

### First Federal Search Warrant At Defendant's Residence And Further Contact With M.B. And H.B.

On August 25, 2020, law enforcement executed a search and seizure warrant at Defendant's residence located on Robertson Farm Circle in Fairfax, Virginia. Law enforcement seized ammunition from the residence, as well as various electronic devices, including Defendant's Apple iPhone bearing phone number 703-577-4848. A list of the seized electronic items is as follows: (a) A Microsoft Surface Pro Serial Number 025613453152; (b) A Dell Laptop Model P30E; (c) An ASUS Laptop Model Q524U; (d) An Apple iPhone 7 IMEI 353 802 082 070 675; (e) An Apple iPhone 7 IMEI 359 458 087 373 582; and (f) A PNY USB Micro Storage Device 16GB (Thumbdrive).

Law enforcement also seized 3 boxes of .44 caliber ammunition from Defendant's residence. Furthermore, from a Federal Firearms Licensee ("FLL") in Fairfax County, law enforcement that same day seized pursuant to a search warrant (1) a Glock 44, semi-automatic, .22LR caliber firearm, serial number AEFZ951, (2) a Glock 44 magazine, .22LR, 10 round capacity, and (3) Streak Visual Ammunition, .44 Special, FMJ, 220 Grain, 20 rounds.

After voluntarily waiving his *Miranda* rights, Defendant agreed to speak with law enforcement. He admitted, among other things, to writing and sending the above-referenced messages to staff at the Hospital, including H.B. and M.B. Defendant was not arrested at that time.

Law enforcement's later review of Defendant's iPhone bearing phone number 703-577-4848 revealed that Defendant during July and August 2020 created a Myspace page in which he posted photos of various individuals, including victim M.B.—many of which were captioned. One of the images of M.B. had the caption, "[M.B.] had hardcore receptive and expressive anal sex with [M.A.'s] brother-in-law." Another image of M.B. had a meme-type caption that read, "Mike Ghali just creampied my pussy." Additional images of M.B. with sexually-explicit captions were on the Myspace page.

On August 28, 2020, Defendant—after obtaining a new apple iPhone and in violation of the protective orders that were then in place—sent M.B. the following message: "I want to have butt sex with your mother El ibn el Arboreliyosee was here." M.B. responded, "Please stop texting me!" Defendant replied, "Shut the fuck up you cocksucking whore."

Moreover, on September 2, 2020, Defendant posted the following message to his Facebook page: "[M.B.] sucked a dildo until tearing a hole in the immediately precessive objet for whatever itios worth."

Immediately thereafter, Defendant wrote, "Prepare to be executed, el ibn el Arboreliyosee."

On October 5, 2020, Defendant sent H.B. an email from minayoussefisacocksuckingslut@gmail.com. The content of the email was largely identical to the June 24, 2020 and June 28, 2020 emails he had previously sent to H.B.

**Second Federal Search Warrant At Defendant's Residence And Further Contact With M.B.**

On October 9, 2020, law enforcement executed a second federal search warrant at Defendant's residence located on Robertson Farm Circle, Fairfax, Virginia 22030, which authorized seizure of among other things, the new Apple iPhone used by Defendant to send the above-described August 28, 2020 message to M.B. Law enforcement ultimately were unable to locate the device, but did locate a receipt for its purchase and packaging material.

Defendant was also arrested at that time. After voluntarily waiving his *Miranda* rights, Defendant falsely claimed that he was not responsible for sending any messages to M.B., that he never had a romantic interest in her, that M.B. was a "random person," and suggested it was possible that a hacker—rather than him—sent the iPhone messages to her. He further stated that no electronic devices would be found by law enforcement in the house.

SO STIPULATED:

_____
Paul Riley
Assistant United States Attorney

Date: 10/12/23

_____
Michael Ghali
Defendant

Date: 10/12/23                          _____
                                        Andrew Szekely, Esq.
                                        Counsel for Defendant